**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 22-cv-0779-WJM-MDB

OASTER DEVELOPMENT, LLC,

      Plaintiff,

v.

WD CONSULTING, d/b/a WD CONSTRUCTION and
WILLIAM D. TIBBITT,

      Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Before the Court is Plaintiff Oaster Development, LLC's ("Oaster" or "Plaintiff")

Motion for Partial Summary Judgment Based on Issue Preclusion Against Affirmative

Defenses of License (ECF No. 144) ("Motion").  Defendants WD Consulting d/b/a WD

Construction ("WD Construction") and William D. Tibbitt (together, "WD Defendants")

filed a response (ECF No. 147), to which Oaster filed a reply (ECF No. 155).  For the

following reasons, the Motion is granted.

## I. BACKGROUND[1]

**A.    Factual Background**

This dispute relates to Oaster's architectural designs for a new church campus

---

[1] The following factual summary is based on the parties' briefs on the Motion and
evidence submitted in support thereof.  The facts set forth herein are undisputed unless
attributed to a party or source.  All citations to docketed materials are to the page number in the
CM/ECF header, which sometimes differs from a document's internal pagination.

for Woodmen Valley Chapel ("WVC") in Monument, Colorado ("Monument Project").
(ECF No. 145 at 1.)

WVC is a church that owns and operates several campuses in the Colorado
Springs area.  (ECF No. 144 at 4 ¶ 2.)  In December 2019, WVC entered into a design
agreement with Oaster (ECF No. 144-5) ("Monument Agreement")—a consultation and
design firm co-owned by Brad Oaster and his wife—pursuant to which Oaster was to
provide, among other things, architectural services for the Monument Project.  (ECF No.
144 at 4 ¶¶ 1, 5; ECF No. 147 at 2 ¶ 1.)  However, WVC unilaterally terminated the
Monument Agreement a few months later, on March 30, 2020.  (ECF No. 144 at 4 ¶ 6;
ECF No. 144-6.)

WVC subsequently hired WD Construction—a limited liability company providing
general construction services, of which Tibbitt is the President and owner (ECF No. 144
at 4 ¶ 3)—to complete construction work on the Monument Project.  (*Id.* at 5 ¶ 7; ECF
No. 147 at 3 ¶ 7.)  WD Defendants[2] in turn hired Bucher Design Studio, Inc.—a
corporation providing architectural services, of which Brian K. Bucher is the President
and (together, "Bucher Defendants")—to provide design services for the Monument
Project.  (ECF No. 144 at 4 ¶ 4, 5 ¶ 8; ECF No. 147 at 3 ¶ 8.)  The parties dispute
whether Bucher Defendants "complete[d] the architectural work [for the Monument
Project] based on plans created by Oaster."  (*Compare* ECF No. 144 at 5 ¶ 8 (citing
ECF No. 144-1 at 16 (where arbitrator found "architect Brian Bucher testified that Bill

---

[2] WD Defendants deny that WVC hired Tibbitt in his individual capacity.  (ECF No. 144 at
5 ¶ 7–8; ECF No. 147 at 3 ¶ 7–8.)  However, as that issue is immaterial to the resolution of this
Motion, the Court refers to WD Construction and Tibbitt collectively herein.

Tibbitt contacted him on March 30, 2020, about finishing a project that had been paid for

and that the drawings could come from Oaster")), *with* ECF No. 147 at 3 ¶ 8 (citing ECF

No. 147-2 at 46:4–6 (where Bucher testified that "we weren't able to use much of it," in

reference to the design documents provided by Oaster)).)

**B.    Procedural History**

In March 2022, Oaster commenced this action against WD Defendants, Bucher

Defendants, and six individuals allegedly comprising WVC's "leadership team"

(collectively, the "WVC Individual Defendants"), asserting, among other claims,

copyright infringement, contributory copyright infringement, and vicarious copyright

infringement.  (*See generally* ECF No. 1.)

In May 2022, WVC and WD Defendants entered into a Defense and

Indemnification Agreement (ECF No. 144-7) ("Defense Agreement"), by which WVC

agreed to defend and indemnify WD Defendants for "Expenses" and "Liabilities"

resulting from this litigation, including but not limited to attorney's fees, costs, and

judgments.  (ECF No. 144 at 6–7 ¶¶ 17–19; ECF No. 144-8.)  WVC also agreed to

indemnify WD Defendants for "amounts paid in settlement," subject to WVC's advance

approval of any settlement reached with Oaster.  (ECF No. 144 at 9 ¶¶ 20–21.)

Separately, WVC, WD Defendants, and Bucher Defendants entered into a joint defense

agreement, which was in effect during the taking of depositions, the defense motions for

summary judgment, and the arbitration proceedings.  (*Id.* at 7 ¶ 22.)

In June 2022, the WVC Individual Defendants moved to stay this action pending

arbitration in accordance with the arbitration provision in the Monument Agreement.

(ECF No. 40.)  Magistrate Judge N. Reid Neureiter granted the motion to stay for a

period of four months.  (ECF No. 48.)  Oaster subsequently voluntarily dismissed the

WVC Individual Defendants "without prejudice, allowing these claims to proceed to

arbitration."  (ECF No. 49.)

In October 2022, the American Arbitration Association instituted arbitration

proceedings on Oaster's claims against WVC and the WVC Individual Defendants.

(ECF No. 144 at 5 ¶ 9; ECF No. 55 at 3.)  James G. Sawtelle, Esq. of Sherman &

Howard represented WVC and the WVC Individual Defendants in the arbitration.  (ECF

No. 144 at 5 at ¶ 12.)  In November 2022, Sawtelle also entered an appearance as

counsel for WD Defendants in this action.  (ECF No. 56.)  However, WD Defendants

were not a party to the arbitration, no representative of WD Defendants testified at

arbitration, and WD Defendants' counsel at Berg Hill Greenleaf Ruscitti LLP (co-counsel

to Sherman & Howard) also did not represent any party at arbitration.  (ECF No. 147 at

5–6 ¶¶ 1–2, 5.)

In June 2023, a panel of three arbitrators (the "Panel") held a six-day evidentiary

hearing on Oaster's claims against WVC and the WVC Individual Defendants,[3] including

claims for copyright infringement and contributory copyright infringement.  (ECF No. 144

at 7 ¶ 23; ECF No. 144-1 at 1–3.)  The parties submitted pre-hearing briefs;

documentary evidence, including over 75 exhibits; the sworn testimony of witnesses;

and post-hearing briefs.  (ECF No. 144 at 7 ¶ 23; ECF No. 144-1 at 2.)

WVC asserted as an affirmative defense that Oaster had granted WVC an

express and/or implied license to use Oaster's copyrighted architectural designs for the

---

[3] Four of the WVC Individual Defendants were dismissed from the arbitration prior to the
evidentiary hearing, leaving two to proceed as defendants at arbitration.  (ECF No. 144-1 at 2.)

Monument Project.  (ECF No. 144 at 7 ¶ 24; *see also* ECF No. 144-1; ECF No. 144-8.)
The Panel rejected WVC's affirmative defenses of express and implied license in its
August 11, 2023 Interim Ruling on the Merits (ECF No. 144-1) ("Interim Ruling").  (ECF
No. 144 at 7 ¶ 25; ECF No. 144-1 at 18 ("[T]he Panel finds that the implied license, like
the express license, was terminated when WVC breached the design agreement.")  The
Panel in turn found Oaster's favor on its copyright infringement claim against WVC
(ECF No. 144 at 7 ¶ 25; ECF No. 144-1 at 18 ("Having found that WVC did not meet its
burden to establish any affirmative defense to copyright infringement, the Panel finds in
favor of Oaster on its claim that WVC infringed its copyrights in the Monument campus
designs.")) and awarded Oaster $160,000 in damages and $230,000 in attorney fees as
the prevailing party on its copyright claims.  (ECF No. 144 at 8–9 ¶ 27–28; ECF No.
144-2 at 6–7.)  The Panel also ordered WVC to bear the arbitrators' compensation and
expenses totaling $155,624.07.  (ECF No. 144 at 9 ¶ 29; ECF No. 144-2 at 7.)  In
December 2023, a Colorado state court confirmed the Panel's final arbitration award
pursuant to the Colorado Uniform Arbitration Act, C.R.S. § 13-22-222.  (ECF No. 144-4.)

Oaster has since settled with Bucher Defendants, and they were accordingly
dismissed from this action in March 2024.  (ECF No. 137.)  Thus, only Oaster's claims
against WD Defendants remain at issue.  Oaster moves for partial summary judgment
"against [WD] Defendants' affirmative defense of license, on the grounds that rulings by
an arbitration panel preclude relitigating the issue of whether [WD] Defendants here had
a license to create derivative architectural plans and drawings from Oaster's
copyrighted architectural work product."  (ECF No. 144 at 3.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit

under the governing law' and is 'genuine[ly]' disputed if 'a reasonable jury could return a

verdict for the nonmoving party.'" *Alcala v. Ortega,* 128 F.4th 1298, 1306 (10th Cir.

2025) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The court

"must view the evidence in the light most favorable to the nonmoving party, as well as

resolve disputed facts and draw 'all justifiable inferences' in favor of the nonmoving

party." *Alcala,* 128 F.4th at 1306 (quoting *Anderson,* 477 U.S. at 255); *see also Tolan v.

Cotton,* 572 U.S. 650, 656–57 (2014). However, "'mere speculation, conjecture, or

surmise' cannot defeat a summary-judgment motion, because '[u]nsubstantiated

allegations carry no probative weight in summary judgment proceedings.'" *Alcala,* 128

F.4th at 1306 (quoting *Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir.

2004)).

## III. ANALYSIS

**A.    Applicable Law**

As a threshold matter, "[t]he source of the law that governs the preclusion

consequences of an arbitration award has not been much developed"—particularly in a

federal-question case such as this. 18B Fed. Prac. & Proc. Juris. § 4475.1 (3d ed.); *see

also Sec. & Exch. Comm'n v. Stuart Frost & Frost Mgmt. Co. LLC,* 2021 WL 6103552,

at *4 (C.D. Cal. Oct. 12, 2021) (observing it is "not well-settled" whether federal or state

law governs the preclusive effects of an arbitration award confirmed by a state court in a

federal-question case).  Nevertheless, Oaster argues the Court need not resolve
whether Colorado or federal law applies because the standards are substantially
identical under either jurisdiction's law.  (ECF No. 144 at 12.)  Notably, WD Defendants
do not argue otherwise.  (*See generally* ECF No. 147.)  The Court agrees with Oaster.
*Boulter v. Noble Energy Inc.,* 74 F.4th 1285, 1289 (10th Cir. 2023) ("[W]e have no
reason to believe federal or Colorado preclusion law would produce different
outcomes.").

"Both federal and Colorado law define issue preclusion similarly."  *Boulter,* 74
F.4th at 1289 (citations omitted); *see also Keller Tank Servs. II, Inc. v. Comm'r of
Internal Revenue,* 854 F.3d 1178, 1193 (10th Cir. 2017) ("Collateral estoppel, or issue
preclusion, . . . bars the re-litigation of an issue of law or fact after it is determined by a
valid, final judgment."); *Sunny Acres Villa, Inc. v. Cooper,* 25 P.3d 44, 47 (Colo. 2001)
("Collateral estoppel, or issue preclusion, is a judicially created, equitable doctrine that
operates to bar relitigation of an issues that has been finally decided by a court in a prior
action.").  Both the Tenth Circuit and the Colorado Supreme Court afford preclusive
effect to confirmed arbitration awards.  *See B-S Steel of Kansas, Inc. v. Tex. Indus.,
Inc.,* 439 F.3d 653, 662 (10th Cir. 2006) ("This circuit has previously applied collateral
estoppel to a confirmed arbitration award."); *Barnett v. Elite Props. of Am., Inc.,* 252
P.3d 14, 22 (Colo. App. 2010) ("The doctrine of issue preclusion applies to issues
decided in arbitration.").  "And most importantly, the issue preclusion jurisprudence for
each share the same four elements."  *Boulter,* 74 F.4th at 1289 (collecting cases).
Specifically, issue preclusion applies when:

(1) the issue is identical to an issue actually litigated and

> necessarily adjudicated in the prior proceeding; (2) the party
> against whom estoppel was sought was a party to or was in
> privity with a party to the prior proceeding; (3) there was a
> final judgment on the merits in the prior proceeding; and (4)
> the party against whom the doctrine is asserted had a full
> and fair opportunity to litigate the issues in the prior
> proceeding.

*Villas at Highland Park Homeowners Ass'n, Inc. v. Villas at Highland Park, LLC,* 394

P.3d 1144, 1152 (Colo. 2017) (citations omitted); *see also Keller Tank Servs. II,* 854

F.3d at 1193 (reciting same elements).

It is not in dispute that the confirmed arbitration award constitutes a final

judgment on the merits. *See Coffey v. Dean Witter Reynolds Inc.,* 961 F.2d 922, 927–

28 (10th Cir. 1992) (arbitration award confirmed by state court was "about as 'final' as

any arbitration award could be").  The Court is thus left to consider (1) whether WD

Defendants' affirmative defenses here are identical to those already litigated at

arbitration, (2) whether WD Defendants are in privity with WVC, and (3) whether WD

Defendants had a full and fair opportunity to litigate the issues in the prior proceeding.

In addition, the Court will consider whether the particular fairness concerns attending

the offensive use of collateral estoppel should prevent its application here.

Ultimately, the Court finds that that WD Defendants are precluded from

relitigating whether any express license they were granted pursuant to the Monument

Agreement survived the Agreement's termination, or whether the post-termination

communications between Oaster and WVC, including Oaster's delivery of the CAD files,

created an implied license.

**B.    Identical Issues**

"To satisfy the first element of issue preclusion, the issue in the present

proceeding must be (1) identical to the prior issue and (2) actually determined in the

prior proceeding." *Huffman v. Westmoreland Coal Co.,* 205 P.3d 501, 506 (Colo. App.

2009). As to the first prong, the Court observes that "[i]ssue preclusion applies to both

legal and factual issues." *Id.; see also In re Tonko,* 154 P.3d 397, 405 (Colo. 2007)

("Issue preclusion bars relitigation of a legal or factual matter already decided in a prior

proceeding."); *Coffey,* 961 F.2d at 925 n.4 ("The doctrine of collateral estoppel . . . bars

relitigation of legal or factual issues that have previously been decided through

arbitration."). Thus, "[i]f two proceedings present different legal issues, but nevertheless

involve the same underlying factual issue, the doctrine of issue preclusion may apply."

*Huffman,* 205 P.3d at 506.

As to the second requirement, "[a] party must have actually litigated the issue in

the prior proceeding and the adjudicatory body must have necessarily decided the

issue." *Tonko,* 154 P.3d at 405. "An issue is actually litigated and necessarily

adjudicated when a party properly raised the issue and a determination on that issue

was necessary to the judgment." *Id.* "[T]hat is, it must have affected the disposition of

the case," *Nat. Energy Res. Co. v. Upper Gunnison Water Conservancy Dist.,* 142 P.3d

1265, 1280 (Colo. 2006), "[b]ecause 'a previous tribunal may not have taken the care

needed to adequately determine an issue'" otherwise. *Tonko,* 154 P.3d at 405 (quoting

*Bebo Constr. Co. v. Mattox & O'Brien, P.C.,* 990 P.2d 78, 86 (Colo. 1999)).

As pertinent here, the Panel considered whether WVC had an affirmative

defense to Oaster's copyright infringement claims either because (1) it had an "express

license in the [Monument Agreement]" (ECF No. 144-1 at 16) or (2) "it had an implied

license to use the Oaster Monument designs because WVC commissioned the designs

and because Oaster delivered the designs to WVC on a CAD file" (*id.* at 17–18).[4]  In

rejecting these defenses, the Panel reasoned "[t]here [was] no dispute that the

[Monument Agreement] gave WVC an express license to use the designs" but that "the

license was terminated when WVC unilaterally terminated the [Monument Agreement]."

(*Id.* at 16.)  And "[w]ith respect to WVC's argument that by delivering the CAD files,

Oaster impliedly licensed WVC to copy and modify the designs," the Panel declined to

find that Oaster's "delivery of the CAD files manifest[ed] an intent to grant an ongoing

license to copy and make derivative works from the designs."  (*Id.* at 18.)

        In this Court's Final Pretrial Order, WD Defendants similarly summarize their

affirmative defenses as follows:

> [WD Defendants] assert defenses to Oaster's copyright
> infringement claims based on express, or alternatively,
> implied licenses authorizing WVC and WD to utilize the
> preliminary drawings developed by Oaster to complete the
> design and construction of the subject Monument Project.
> Specifically, the Design Agreement between WVC and
> Oaster included express provisions that authorized the
> Project Owner (WVC) and Builder (WD) to use the
> preliminary designs for the construction of the Project.  In the
> alternative, under the facts of this case, Oaster granted an
> implied license to WVC.  Here, WVC requested Oaster to
> create design documents for the Monument Project, Oaster
> did create such designs and was paid in full.  Oaster then
> hand-delivered a thumb drive with the CAD files for the
> design documents to WVC in exchange for final payment for
> Oaster's design services.  These facts establish the
> elements necessary to demonstrate the creation of an
> implied license.

---

[4] WVC appears to have also argued in arbitration that its post-termination
communications with Oaster created an *express* license, but the Court does not understand WD
Defendants to argue it also has an affirmative defense of express license on these grounds.
(ECF No. 144-1 at 16.)

(ECF No. 106 at 2.)  Oaster argues these affirmative defenses are identical to those
resolved at arbitration, particularly because WD Defendants "do not claim that Oaster
directly granted it a license to use Oaster's copyrighted work product" but instead that
"Oaster granted a license to WVC, and that the license WVC received authorized [WD] .
. . to utilize Oaster's architectural work product."  (ECF No. 144 at 6 ¶ 15.)[5]  WD
Defendants dedicate only a short paragraph of their response to refuting the identicality
of WVC's license defense and their own.  Nevertheless, they argue that, to the contrary,
"WD's argument for a license includes both a derivative license and its own license,"
and "the existence of an express license from Oaster to WD . . . was not addressed in
the Arbitration."  (ECF No. 147 at 11.)  Ultimately, the Court agrees with Oaster.

Like Oaster, the Court at least does not read WD Defendants' response to
meaningfully dispute that its *implied* license defense in this litigation turns on the same
facts as WVC's implied license defense at arbitration.  (*See* ECF No. 155 at 6.)  Indeed,
in its pending motion for summary judgment, WD Defendants argue their defense of
implied license under a subsection entitled "Oaster Granted an Implied License to
WVC," in which they rely entirely upon post-termination communications between
Oaster *and WVC,* culminating in Oaster's delivery of the CAD files *to WVC*.  (*See* ECF
No. 145 at 10–13.)  As noted, the Panel rejected the existence of an implied license
based on these very same facts at arbitration.  (ECF No. 144-1 at 17–18.)  WD
Defendants' defense to copyright infringement predicated on WVC's implied license can
extend no further.

---

[5] Although the Court considers it here, it notes that Oaster improperly advanced this
legal argument in its Statement of Facts.

As to WD Defendants' express license defense, WD Defendants have given the Court no factual or legal grounds upon which it could conclude that the Panel's determination that WVC's express license terminated with the Monument Agreement is not also necessarily determinative of the continuing validity of any express license purportedly granted to WD Defendants pursuant to the *same contractual provision*— even assuming they were independent licensees.[6]  In their cross motion for summary judgment, WD Defendants dispute whether the express license was revoked when WVC terminated the Monument Agreement in the first instance.  (ECF No. 156 at 7–8).  But this argument goes to the correctness of the Panel's decision—not whether WD Defendants' express license defense is distinct from WVC's.  The Court does not inquire into whether an issue was rightly or wrongly decided in the prior proceeding in considering whether issue preclusion should apply.  *See B&B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138, 157 (2015) ("issue preclusion prevent[s] relitigation of wrong decisions just as much as right ones") (citation omitted and alterations in original).

Accordingly, the Court finds the issues of (1) whether Oaster granted WVC an

---

[6] Although it does not conclusively decide the issue, the Court has reservations that WD Defendants are best categorized as independent licensees—particularly as it is undisputed that WD Defendants are not a signatory to the Monument Agreement and the Monument Agreement was terminated *before* WD Defendants were even hired as general contractor for the Monument Project.  Rather, the Court suspects that only WVC was a "licensee," whose scope of license—had it perpetuated—expressly granted it permission to share the protected architectural designs with its contractor, WD Defendants.  *See Great Minds v. Office Depot, Inc.,* 945 F.3d 1106, 1110 (9th Cir. 2019) ("A licensee's hiring of a third-party copy service to reproduce licensed material strictly for the licensee's own permitted use does not turn that third party into a third party that is bound to the License terms."); *Great Minds v. Fedex Office & Print Servs., Inc.,* 886 F.3d 91, 96 (2d Cir. 2018) ("Great Minds' licensees may rely on *non-employee* agents in carrying out permitted uses without converting those agents into independent licensees."); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.,* 421 F.3d 1307, 1315 (Fed. Cir. 2005) (independent repair company that copied protected work on behalf of its customers-licensees was not liable for copyright infringement).

implied license and (2) whether the express license in the Monument Agreement
survived the Agreement's termination are identical to issues presented in this litigation.
As to the second prong, the Court has little trouble finding these issues were also
necessarily adjudicated by the Panel.  Had it determined that WVC's express license
survived termination of the Monument Agreement or that Oaster's delivery of the CAD
files otherwise created an implied license, WVC would not have been found liable for
copyright infringement, which the Panel's Interim Ruling makes clear.  (ECF No. 144-1
at 18 ("Having found that WVC did not meet its burden to establish any affirmative
defense to copyright infringement, the Panel finds in favor of Oaster on its claim that
WVC infringed its copyrights in the Monument campus designs.").)

The Court accordingly finds the first element of issue preclusion is met.

## C.    Privity

Next, Oaster must show "that the party against whom issue preclusion is
asserted has been a party in the prior proceeding or is in privity with a party to the prior
proceeding."  *Tonko,* 154 P.3d at 406; *Keller Tank Servs. II,* 854 F.3d at 1193.  There is
no dispute that WD Defendants were not a party to the arbitration.  Thus, the Court's
analysis is limited to whether WD Defendants are in privity with WVC.

"Despite its long pedigree in the law [], privity remains an elusive concept."
*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,* 847 F.3d 1221, 1240 (10th Cir. 2017)
(citations omitted).  Traditionally, "privity" collectively referred to "[t]he substantive legal
relationships justifying preclusion," but "[t]he term has also come to be used more
broadly, as a way to express the conclusion that nonparty preclusion is appropriate on
any ground."  *Taylor v. Sturgell,* 553 U.S. 880, 894 n. 8 (2008); *see also Entek GRB,*

*LLC v. Stull Ranches, LLC,* 763 F.3d 1252, 1258 (10th Cir. 2014) ("privity is but a label .

. . that seeks to convey the existence of a relationship sufficient to give courts

confidence that the party in the former litigation was an effective representative of the

current party's interests"); *Pub. Serv. Co. v. Osmose Wood Preserving, Inc.,* 813 P.2d

785, 788 (Colo. App. 1991) ("[A] finding of privity is simply a conclusion that something

in the relationship of party and non-party justifies holding the latter to the result reached

in litigation in which only the former is named.") (citation omitted).  Thus, "no definition of

privity can be automatically applied in all cases . . . ."  *Pelt v. Utah,* 539 F.3d 1271, 1281

(10th Cir. 2008) (internal quotation marks omitted).

Under federal jurisprudence, privity minimally requires "a substantial identity

between the issues in controversy and showing the parties in the two actions are really

and substantially in interest the same."  *Lowell Staats Min. Co. v. Philadelphia Elec. Co.,*

878 F.2d 1271, 1275 (10th Cir. 1989).  The Supreme Court has provided only limited

guidance on the boundaries of privity, but in its most recent decision on the subject

"expressly rejected an expansive doctrine of virtual representation as an exception to

the general rule against nonparty preclusion, and described six recognized (non-

conclusive) exceptions to the general rule under federal common law."  *Sierra Club v.*

*Two Elk Generation Partners, Ltd. P'ship,* 646 F.3d 1258, 1267 (10th Cir. 2011) (citing

*Taylor,* 553 U.S. at 893–95).  Oaster invokes the third exception, providing that, "in

limited circumstances, a nonparty may be bound by a judgment because she was

adequately represented by someone with the same interests who [wa]s a party to the

suit."  *Taylor,* 553 U.S. at 894 (internal citation and quotation marks omitted).[7]  However,

---

[7] Oaster also invokes the fifth exception described in *Taylor,* in conjunction with which

> [a] party's representation of a nonparty is 'adequate' for
> preclusion purposes only if, at a minimum: (1) the interests
> of the nonparty and her representative were aligned, []; and
> (2) either the party understood herself to be acting in a
> representative capacity or the original court took care to
> protect the interests of the non-party, [].  In addition,
> adequate representation sometimes requires (3) notice of
> the original suit to the persons alleged to have been
> represented, [].

*Id.* at 900 (internal citations omitted).

As articulated by the Colorado courts, "[p]rivity between a party and a nonparty requires both a substantial identity of interests and a working or functional relationship . . . in which the interests of the non-party are presented and protected by the party in the litigation."  *Cruz v. Benine,* 984 P.2d 1173, 1176 (Colo. 1999) (citations omitted). Notably, the Colorado courts, too, appear to have taken into account the Supreme Court's guidance in *Taylor* in considering whether a nonparty was adequately represented in a prior proceeding sufficient to support a finding of privity.  *See Kowalchik v. Brohl,* 411 P.3d 681, 685–86 (Colo. App. 2012) (discussing *Taylor*); *Goldsworthy v. Am. Fam. Mut. Ins. Co.,,* 209 P.3d 1108, 1116 (Colo. App. 2008) (same).  Thus, Colorado courts find "[a] nonparty is adequately represented for

---

the Supreme Court reasoned "a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy," such that "preclusion is appropriate when a nonparty later brings suits as an agent for a party who is bound by a judgment."  553 U.S. at 894–95.  However, the Court agrees with WD Defendants that it is unclear this particular exception applies where the party bound by the first judgment and purported proxy are *defendants*.  *See* 18A Wright & Miller § 4449, n. 15 (3d ed.) (citing *Guess v. Bd. of Med. Examiners of State of N.C.,* 967 F.2d 998, 1005–06 (4th Cir. 1992) (patients "effectively seek to relitigate the claims of [physician] that were previously decided in a prior action" "[i]n limiting their prayer for relief to an injunction against the Board's revocation of [physician's] medical license"); *St. Louis Typographical Union No. 8, AFL-CIO v. Herald Co.,* 402 F.2d 553, 556 (8th Cir. 1968) (after 154 individual employees lost an action to compel award of severance pay, their union could not bring an action to compel same award)).  Accordingly, the Court focuses its analysis on the third exception.

preclusion purposes if the interests of the nonparty and his or her representative are
aligned, and the procedure applied by the original court fairly ensured the protection of
the interests of the nonparty."  *Goldsworthy,* 209 P.3d at 1116.

The Court will accordingly analyze whether WD Defendants were adequately
represented in the arbitration by WVC by considering whether (1) their interests are
aligned and (2) WD Defendants' interests were presented and protected by WVC in the
arbitration proceedings.

1.    Identity of Interests

Perhaps unsurprisingly, the Court notes at the outset that Oaster does not
appear to have identified any case analyzing whether parties claiming identical licenses
to use the same copyrighted works for the same purpose are in privity.  The Court's
research, too, has revealed very few cases analyzing privity in the copyright licensing
context.  Nonetheless, the Court has identified a series of cases in the Fourth Circuit
analyzing privity with respect to "downstream infringers" of a copyright, which it finds
informative here.  Based on the reasoning therein, the Court finds that WVC and WD
Defendants' legal interests are aligned.

In that line of cases, the individual plaintiff claimed he had a copyright interest in
certain logos adopted and used by the Baltimore Ravens football team.  *Bouchat v.
Champion Prods., Inc.,* 327 F. Supp. 2d 537, 539 (D. Md. 2003).  Significantly, the
marketing arm of the National Football League ("NFLP") had granted licenses and other
forms of permission to use the logos to "hundreds of manufacturers, distributors,
sponsors, etc. in connection with their respective business operations," believing the
logos to have been developed in-house.  *Id*.

16

In a first action, the plaintiff sued the Ravens and NFLP for infringement of his copyright interests in certain Ravens team logos.  *Id.* at 538–40.  In the liability phase of trial, the jury found in plaintiff's favor on one of the copyrighted drawings at issue.  *Id.* at 540.  While the first action was pending, the plaintiff also filed at least four separate infringement lawsuits against the many licensees to whom NFLP had ostensibly granted permission to use the logos.  *Id.* at 540–42.  On summary judgment in the subsequent, consolidated actions against the licensees, the plaintiff sought to bind the licensees by the jury's verdict in his favor as to infringement of the one drawing.  *Id.* at 542.

Although the licensees were nonparties to the first action, the district court agreed they were in privity with NFLP and thus bound by its findings.  *Id.* at 543.  In specifically considering whether the interests of NFLP and the licensees were "so closely aligned" as to support a finding of privity, the district court noted (1) the licensees "used the [logo] by virtue of a contractual right granted by NFLP"; (2) "[t]hey did so based upon NFLP's guarantee that [the logo] could legally be used by them"; (3) they "used the [logo] with indemnification by NFLP against any claim or liability for such use"; (4) "NFLP [was] providing the [licensees] with the very same counsel who represented NFLP in [the first action]"; and (5) "there [was] no material difference, if there is any difference at all, between the liability issues presented in [the first action] and those presented in [the subsequent litigation against the licensees]."  *Id.* at 543.

Many of the same considerations apply here.  True, *Bouchat* differs insofar as NFLP believed itself to be the copyright owner whereas, here, WVC argued at arbitration that it was also a licensee.  Nonetheless, WD Defendants' asserted license to use Oaster's architectural designs necessarily flows through WVC in much the same

way as the licensees' purported permission to use the logos flowed through NFLP in

*Bouchat*. That is, even to the extent WD Defendants maintain they had an independent,

express license, that license was granted pursuant to a contract to which only WVC was

a signatory and in furtherance of a construction project commissioned at WVC's behest.

Thus, while WD Defendants may not have used the copyrighted architectural designs

by virtue of a contractual right *granted* by WVC, they did so in accordance with a license

*contracted for* by WVC. WD Defendants' defense predicated on Oaster's granting an

implied license to WVC presents an even clearer case of the parties' alignment of

interests, akin to the "derivative or conditional rights privity" line of New York cases

identified by Oaster, where

> a nonparty to a prior litigation may be collaterally estopped
> by a determination in that litigation by having a relationship
> with a party to the prior litigation such that his own rights or
> obligations in the subsequent proceeding are conditioned in
> one way or another on, or derivative of the rights of the party
> to the litigation.

*D'Arata v. New York Cent. Mut. Fire Ins. Co.,* 564 N.E.2d 634, 637 (N.Y. App. 1990).

In this way, both parties had an interest in a finding at arbitration that WVC's

express license survived termination of the Monument Agreement, or otherwise that

Oaster granted WVC an implied license to continue using the designs post-

termination—findings that WD Defendants surely would have also attempted to use to

their benefit in this litigation had the Panel decided in WVC's favor. *Foster v. Plock,* 394

P.3d 1119, 1126 (Colo. 2017) (finding alignment of interests between different

defendants where "both parties had an interest in a judgment that [their conduct] did not

injury [plaintiff] or result in damages that would support his claims against [them],

respectively").

And as Oaster points out, this alignment of interests is further evidenced by WVC's agreement to indemnify WD Defendants against any claim or liability for their use of the copyrighted architectural works, and the fact that WD Defendants are represented in this action by the same counsel at Sherman & Howard who represented WVC at arbitration.  Both of these intertwining sets of circumstances were at play in *Bouchat,* and both were taken into account by that court in its analysis.  (ECF No. 144 at 26); *see also SpeedTrack, Inc. v. Office Depot, Inc.,* 2014 WL 1813292, at *6 (N.D. Cal. May 6, 2014) (in patent infringement action, finding privity element of res judicata satisfied where defendant in earlier action was "contractually obligated to indemnify defendants for any losses stemming from a finding of infringement").

Taken together, these considerations persuade the Court that WVC and WD Defendants' legal interests are quite closely aligned.

2.    <u>Functional Relationship</u>

Turning to the second prong of the analysis, "[t]here is a functional relationship when the absent parties' interests are presented and protected in the prior litigation." *Goldsworthy,* 209 P.3d at 1116; *see also Foster,* 394 P.3d at 1126.  Here again, the Court looks to *Bouchat* to guide its analysis, ultimately finding that WD Defendants' interests were presented and protected by WVC in the arbitration proceedings.

After finding an alignment of interests between NFLP and the licensees, the *Bouchat* court proceeded to consider whether NFLP acted as a virtual representative for the licensees "with at least the tacit approval of the court," as required by the Fourth Circuit to establish privity by adequate representation.[8]  *Bouchat,* 327 F. Supp. 2d at

─────────────

[8] Importantly, although the *Bouchat* court expressly based its finding of privity between

543 (quoting *Klugh v. United States,* 818 F.2d 294, 300 (4th Cir. 1987)).  It reasoned

that, although the licensees "did not give explicit approval to NFLP to virtually represent

the interests of the [licensees] because the matter was not presented to the Court," "it

[was] beyond doubt that had the matter been presented, [the] Court would have

approved NFLP's representation of its licensees and others using the logos at issue by

virtue of NFLP permission."  *Id.* at 543.  Moreover, insofar as the first action "involved

the very same sales of [] Logo-bearing merchandise . . . at issue in [the subsequent

actions against the licensees]," the licensees "reliance upon NFLP to litigate the issues

in [the first action] was perfectly obvious."  *Id.* at 543–44.  "Of course, no [licensee]

expressed any interest in joining [the first action] or expressed any concern with having

NFLP present the defense position in [the first action] on issues that were common to

[the subsequent litigation against the licensees]."  *Id.* at 544.  It reiterated that "all (or at

least virtually all) of the [licensees] were represented by the same counsel as NFLP . . .

."  *Id.*

　　Here, there can be no dispute that WD Defendants were on notice of the

arbitration proceedings.  WD Defendants have been a party to this action since its

inception, and WVC and Oaster briefed whether to stay these proceedings pending the

---

NFLP and the licensees on the doctrine of "virtual representation," it is this second prong of the
analysis which persuades the Court that it was, in actuality, applying a category of privity
equivalent to adequate representation.  *See Taylor,* 553 U.S. at 896 (while rejecting the broad
doctrine of virtual representation adopted by some lower courts, noting that still "[s]ome Circuits
use the label, but define 'virtual representation' so that it is no broader than the recognized
exception for adequate representation").  Indeed, the *Bouchat* court observed the Fourth Circuit
had rejected that an alignment of interests alone was "sufficient to justify applying res judicata
effect on the basis of the virtual representation doctrine."  *Bouchat,* 327 F. Supp. 2d at 543
(citing *Klugh v. United States,* 818 F.2d 294, 300 (4th Cir. 1987)); *see also Wise v. City of
Norfolk,* 215 F.3d 1324 (4th Cir. 2000) (unpub.) (restating rule that a court must at least be on
notice that the party is virtually representing the interests of the non-party).

outcome of arbitration early in this litigation.  (*See* ECF Nos. 40, 46.)  While surely

aware that the validity of WVC's affirmative defense of license would be adjudicated in

arbitration, there is no indication in the record that WD Defendants sought to submit to

the arbitration of WVC's infringement claims against them, too, to preserve their

defense position, nor did they oppose WVC's motion to stay these proceedings pending

arbitration.  That is so even though WVC's defense of license "inevitably paralleled a

defense that [WD Defendants] would have made" had they been parties to the

arbitration.  *Foster,* 394 P.3d at 1126.  And like the court in *Bouchat,* this Court also

reiterates that WD Defendants are at least partly represented by the same counsel as

WVC.

Accordingly, the Court finds that WD Defendants' interests were presented and

protected by WVC in the arbitration proceedings.  In turn, the Court thus also concludes

WD Defendants' interests were adequately represented by WVC in arbitration, and thus

the privity requirement is met.

**D.    Full and Fair Opportunity to Litigate**

The Court must next consider whether WD Defendant had a full and fair

opportunity to litigate the issues in the arbitration proceedings.  It concludes that they

did.

Determining whether a party had a full and fair opportunity to litigate requires the

Court to consider:

> [W]hether the remedies and procedures in the first
> proceeding are substantially different from the proceeding in
> which [issue preclusion] is asserted, whether the party
> in privity in the first proceeding has sufficient incentive to
> vigorously assert or defend the position of the party against
> which [issue preclusion] is asserted, and the extent to which

the issues are identical.

*In re Water Rights of Elk Dance Colo., LLC,* 139 P.3d 660, 669 (Colo. 2006); *see also
Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation,* 975 F.2d 683, 689 (10th
Cir. 1992) ("full and fair opportunity to litigate an issue [o]ften . . . will focus on whether
there were significant procedural limitations in the prior proceeding, whether the party
had the incentive to litigate fully the issue, or whether effective litigation was limited by
the nature or relationship of the parties" (internal citation and quotation marks omitted)).

Oaster argues that WD Defendants had a full and fair opportunity to litigate
because, first, "the procedures before the Arbitration Panel were akin to a judicial trial."
(ECF No. 144 at 27.)  It notes that "[t]he Panel conducted a six-day evidentiary hearing
with counsel for all parties present, and the parties 'submitted pre-hearing briefs,
documentary evidence, the sworn live testimony of witnesses, deposition testimony
taken under oath, sworn statements of experts, opening statements, closing argument,
post-hearing briefs and oral argument.'" (*Id.* (quoting ECF No. 144-2 at 2).)  The Court
would further add that, following the evidentiary hearing, the Panel summarized its
factual findings and legal conclusions in a detailed, 23-page Interim Ruling.  (ECF No.
144-1.)  The Court agrees these procedures are substantially similar to those that would
be available at a trial in this forum.  *See Barnett v. Elite Props. of Am., Inc.,* 252 P.3d
14, 22 (Colo. App. 2010) (three-day evidentiary hearing in arbitration proceedings
provided party with full and fair opportunity to litigate issues involved); *Quist v.
Specialties Supply Co., Inc.,* 12 P.3d 863 (Colo. App. 2000) (finding full and fair
opportunity to litigate where "the arbitration award represents that it is based on the
testimony of sworn witnesses and the arbitrator's review of exhibits and briefs, as well

as the arguments of counsel"); *cf. Murphy-Sims v. Owners Ins. Co.,* 2017 WL 2865679
(D. Colo. Mar. 17, 2017) (finding party did not have a full and fair opportunity to litigate
in part because "arbitration hearing lasted only one day").

Oaster additionally argues that WVC had "clear incentive to litigate vigorously in
arbitration . . . to avoid a judgment for copyright infringement and having to pay Oaster's
attorney fees." (ECF No. 144 at 27.) The Court agrees. The damages awarded Oaster
at arbitration was no nominal sum. (ECF No. 144-1 at 22 (awarding $160,000 in
infringement damages).) And WVC indeed may have had an even *greater* incentive to
litigate vigorously at arbitration than would have WD Defendants, insofar as it is WVC
that will be on the hook for any subsequent finding of infringement against WD
Defendants pursuant to their Defense Agreement.

Still, WD Defendants argue they did not have a full and fair opportunity to litigate
for three reasons. First, they assert "WD is not in privity with WVC, which cuts against a
finding of a full and fair opportunity to litigate." (ECF No. 147 at 14.) As discussed
above, the Court has determined otherwise. Second, they argue that "WD's direct
license was not litigated in the Arbitration since WD was not a party to the Arbitration,
and no other party appears to have made arguments regarding the nature of WD's
licenses." (*Id.*) However, as also discussed herein, the facts determinative of WD
Defendants' affirmative defense of license are materially identical to the facts
determinative of WVC's affirmative defense of license. (*See also* ECF No. 145.) Thus,
it appears insubstantial to the Court whether WVC or WD Defendants were identified as
the license holders. *Cf. B-S Steel of Kansas, Inc. v. Texas Indus., Inc,* 439 F.3d 653,
665 (10th Cir. 2006) (rejecting party's argument "that it did not have a full and fair

opportunity to litigate the issue because of its inability to present to the arbitration panel [certain new evidence]" because the evidence was "not significant for purposes of [plaintiff's] damages claim and thus did not affect [plaintiff's] opportunity to litigate the issue").

Finally, WD Defendants argue that they were "not represented at the Arbitration hearing and no one from WD testified at the Arbitration hearing."  (ECF No. 147 at 14.) WD Defendants' argument is belied by the Court's finding above that they are in privity with WVC precisely because WVC adequately represented their interests at trial before the Panel.  Moreover, the Court notes that "actual litigation is different from a full and fair opportunity to litigate."  *In re Behrends,* 2015 WL 5728825, at *5 (D. Colo. Sept. 30, 2015) (citing *Elk Dance Colo., LLC,* 139 P.3d at 669).  While true that WD Defendants were not named as a party at arbitration, the Court reiterates that there is no indication in the record that WD Defendants made any effort to consent to join the arbitration proceedings, of which they had full and timely notice, much less that there was any opposition by Oaster to such efforts.

The Court thus finds that WD Defendants had a full and fair opportunity to litigate.

As a result, the Court also concludes that all of the requisite elements of issue preclusion are satisfied.

**E.    Unfairness**

Finally, insofar as Oaster frames its Motion as specifically seeking application of "offensive non-mutual issue preclusion" (ECF No. 144 at 10), the Court rejects WD Defendants' argument that the application of offensive collateral estoppel would be

"manifestly unfair" under the circumstances (ECF No. 147 at 14.)

"Offensive nonmutual collateral estoppel" has traditionally described "when a plaintiff seeks to preclude a defendant from relitigating an issue that the defendant previously litigated unsuccessfully in another action against another party." *Antelope Co. v. Mobil Rocky Mountain, Inc.*, 51 P.3d 995, 1003 (Colo. App. 2001) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979)).[9] Construing this rigidly, WD Defendants argue that "Oaster is not in the class of litigants that can avail itself of offensive non-mutual issue preclusion" because here a plaintiff (Oaster) is seeking to preclude a defendant (WD Defendants) from relitigating an issue *another party* (WVC) previously litigated unsuccessfully in another action against the *same plaintiff* (Oaster). (ECF No. 147 at 6.)  The Court is unpersuaded this deprives Oaster of "standing" to invoke issue preclusion against WD Defendants.  If anything, the Court questions whether Oaster's invocation of collateral estoppel is appropriately labeled as "nonmutual" at all, since courts seem to apply that label to the party *asserting* collateral estoppel as well.  *Martinez v. Nash Finch Co.,* 2013 WL 1313899, at *9 (D. Colo. Mar. 29, 2013) ("Where the party asserting collateral estoppel was not a party to the prior case, the doctrine is further classified as 'nonmutual' collateral estoppel.")

Nevertheless, the Court will consider the fairness considerations attaching to the offensive use of collateral estoppel, assuming they apply here.  Both the Tenth Circuit and Colorado courts recognize that "[w]hen the applicability of nonmutual offensive

---

[9] By contrast, nonmutual defensive issue preclusion occurs when "a defendant seeks to preclude a plaintiff from re-litigating a claim or issue for which the plaintiff previously litigated and lost against a different defendant."  *Foster,* 394 P.3d at 1124 n.5.

issue preclusion is in question, other considerations come into play." *Vanderpool v.*
*Loftness,* 300 P.3d 953, 958 (Colo. App. 2012). These "other considerations" originate
with the Supreme Court's decision in *Parklane Hosiery Co., Inc. v. Shore,* where it
observed that "offensive use of collateral estoppel does not promote judicial economy in
the same manner as defensive use does . . . ." 439 U.S. 322, 329 (1979).

Many of the Supreme Court's concerns with the offensive use of collateral
estoppel are subsumed under the inquiry into whether the party to be estopped (or its
privy) had a full and fair opportunity to litigate in the first action. Remaining is the
Supreme Court's concern that, where "[d]efensive use of collateral estoppel precludes a
plaintiff from relitigating identical issues by merely 'switching adversaries,'" thus "giv[ing]
a plaintiff a strong incentive to join all potential defendants in the first action if possible,"
"[o]ffensive use of collateral estoppel . . . creates precisely the opposite incentive." *Id.*
at 329–30. That is, "[s]ince a plaintiff will be able to rely on a previous judgment against
a defendant but will not be bound by that judgment if the defendant wins, the plaintiff
has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by
another plaintiff will result in a favorable judgment." *Id.* at 330. In this way, the
Supreme Court surmised that "offensive use of collateral estoppel w[ould] likely
increase rather than decrease the total amount of litigation, since potential plaintiffs will
have everything to gain and nothing to lose by not intervening in the first action." *Id.*

These fairness concerns are simply not attendant here, where Oaster was itself a
party to the first proceeding and is similarly bound by the Panel's award. Oaster further
persuasively notes that it could not have simply named WD Defendants as a party to
the prior action since it was an arbitration proceeding, which requires consent of the

parties to participate.  (ECF No. 144 at 28.)  To the contrary, Oaster argues—and the Court agrees—the application of offensive collateral estoppel here furthers the doctrine's intended purpose: "to promote judicial efficiency, encourage reliance on previously adjudicated matters, and avoid inconsistent rules of decision."  *Stan Lee Media, Inc. v. Walt Disney Co.,* 774 F.3d 1292, 1297 (10th Cir. 2014).  A finding in this litigation that (1) WD Defendants had an express license to use the copyrighted architectural designs and that such license survived the Monument Agreement's termination, or that (2) WD Defendants had an implied license based on Oaster's delivery of the CAD files for the designs *to WVC,* would certainly and unacceptably yield an incongruous result.

For these reasons, the Court will exercise its broad discretion to apply offensive issue preclusion to disallow WD Defendants from relitigating these same issues.  *See Vanderpool,* 300 P.3d at 959 ("[B]ecause of the unique concerns implicated by the use of nonmutual offensive issue preclusion, district courts have 'broad discretion' to determine whether nonmutual offensive issue preclusion should be applied.") (citation omitted); *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.,* 725 F.3d 1213, 1221 (10th Cir. 2013) ("[T]he decision to apply offensive collateral estoppel lies within the court's 'broad discretion.'") (citation omitted).

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Partial Summary Judgment (ECF No. 144) is GRANTED.  The Court finds in favor of Oaster and against WD Defendants on the latter's affirmative defense that Oaster granted them an express and/or implied license to use Oaster's copyrighted architectural designs for the

Monument Project.

Dated this 17th day of April, 2025.

BY THE COURT:

William J. Martínez
Senior United States District Judge