IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge William J. Martínez**

Civil Action No. 22-cv-0779-WJM-MDB

OASTER DEVELOPMENT, LLC,

      Plaintiff,

v.

WD CONSULTING, d/b/a WD CONSTRUCTION,
WILLIAM D. TIBBITT,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

      Before the Court is WD Consulting, d/b/a WD Construction ("WD Construction")

and William D. Tibbitt's (together, "WD Defendants") Motion for Summary Judgment

(ECF No. 145) ("Motion"). Plaintiff Oaster Development, LLC ("Oaster") filed a response

(ECF No. 154), to which WD Defendants filed a reply (ECF No. 156).

      For the following reasons, the Motion is granted in part and denied in part.

## I. BACKGROUND[1]

The Court incorporates by reference the background set forth in its Order

---

[1] The following factual summary is based on the parties' briefs on the Motion and
evidence submitted in support thereof. The facts set forth herein are undisputed unless
attributed to a party or source. At the outset, the Court notes that, for brevity, it omits those
facts otherwise material to Oaster's copyright infringement claims and WD Defendants' asserted
defenses, based on its finding in Section III *supra*. All citations to docketed materials are to the
page number in the CM/ECF header, which sometimes differs from a document's internal
pagination.

granting Oaster's Motion for Partial Summary Judgment (ECF No. 162) and adds the following pertinent facts.

This dispute arises from the design and construction of a new church campus for Woodmen Valley Chapel ("WVC") in Monument, Colorado ("Monument Project"). (ECF No. 145 at 1.) At all relevant times, WVC's "Leadership Team" consisted of Josh Lindstrom, Joe Stowell, Tojy Thomas, and Doug Olsen, who operated through "consensus decision making," and WVC employed Les Krohnfeldt as its director of campus development. (*Id.* at 3 ¶¶ 1–3.)

WVC's relationship with architectural firm Oaster began in December 2018, when they entered into a Design Agreement ("Heights Agreement") for "[t]he addition of a new children's ministry center and office facility" at WVC's Woodmen Heights Campus ("Heights Project"). (ECF No. 145 at 3 ¶ 5; ECF No. 145-3 at 2.) Krohnfeldt served as WVC's representative for the Heights Project. (ECF No. 145 at 3 ¶ 4.) The design team consisted of Oaster (principally, Brad Oaster), Pat Morgan (the architect), and two other firms (collectively, "Oaster's Design Team" or "Design Team"). (*Id.* at 4 ¶ 8.) WVC engaged WD Construction as the general contractor for the Heights Project. (*Id.* at 4 ¶ 9.)

Khronfeldt was apparently opposed to engaging Oaster for the Heights Project. (ECF No. 154 at 6 ¶ 16; ECF No. 156 at 4 ¶ 16.) He testified at deposition that he believed "bring[ing] [Oaster] on board [was] a duplication of efforts and resources" because Khronfeldt and Oaster had "overlapping responsibilities." (ECF No. 154 at 6 ¶ 16; ECF No. 156 at 4 ¶ 16.) Prior to contracting with Oaster and WD Construction, WVC had engaged a different design firm and general contractor for the Heights

2

Project, with whom Khronfeldt was "most comfortable . . . based on his prior relationship with them for earlier building projects."  (ECF No. 145 at 3 ¶ 6; ECF No. 154 at 8 ¶ 15.) It is unclear from the parties' briefs whether WVC terminated pending agreements with these initial contractors before hiring Oaster, or whether they had only been retained to perform preliminary work on the Heights Project, which had been completed by the time Oaster was engaged.  (ECF No. 145 at 3 ¶ 7; ECF No. 154 at 5 ¶ 6.)

Nevertheless, roughly a year later, the Leadership Team decided to hire Oaster for a second project.  (ECF No. 145 at 4 ¶ 12.)  Thus, in December 2019, WVC and Oaster entered into a Design Agreement ("Monument Agreement") for the Monument Project, pursuant to which Oaster would provide design services, including schematic designs, design development, and construction documents, for the purpose of obtaining building permits.  (*Id.* at 4 ¶ 10.)

At some earlier time, before WVC engaged Oaster, Khronfeldt also served as WVC's representative for the Monument Project.  (ECF No. 154 at 8 ¶¶ 17–18.) However, the Leadership Team removed Khronfeldt from the Project (against his wishes), and he was replaced by Edward Houle.  (ECF No. 145 at 4 ¶ 13; ECF No. 154 at 8 ¶¶ 17–19.)  Thus, Houle signed the Monument Agreement on behalf of WVC.  (ECF No. 154 at ¶ 20.)

When it came time to engage a general contractor for the Monument Project, Khronfeldt recommended that Houle meet with WD Construction (ECF No. 145 at 4 ¶ 14), and Oaster recommended that Houle meet with Great West Construction ("Great West") (*id.* at 5 ¶ 15.)  In mid-January 2020, representatives of WVC, Oaster, and WD Construction met to discuss WD Construction's candidacy as general contractor.  (*Id.* at

5 ¶ 18.)  Ultimately, Houle, Oaster, and others involved in the Project decided to hire

Great West.  (*Id.* at 5 ¶ 16.)  Houle notified WD Defendants of WVC's decision the

following day.  (*Id.* at 5 ¶ 19.)

Meanwhile, WD Construction's work on the Heights Project continued alongside

Oaster.  In February and March 2020, tensions ostensibly grew between one or more

combinations of WD Construction, Oaster, the Leadership Team, and Khronfeldt, as

best evidenced by the series of communications cited by the parties:

- On February 10, WD Construction submitted a request for information ("RFI 16") to Oaster's Design Team related to a "Water Connection to existing Building" for the Heights Project.  (*Id.* at 5 ¶ 20; ECF No. 145-8 at 1.)

- On February 20, Khronfeldt sent an email to Tibbitt, attaching a PDF partly entitled "WVC Monument Campus" and adding to the body of his e-mail, "For 'side' discussion.  MO plan changes."  (ECF No. 154-9 at 1.)  According to WD Defendants, "Mr. Tibbitt did not respond to this email."  (ECF No. 156 at 13.)

- Later that same day, Oaster sent an email to Khronfeldt concerning "a couple items" that arose at that morning's weekly Owner-Architect-Contractor ("OAC") meeting—namely, an apparent disagreement concerning Khronfeldt's expectation that Oaster would personally attend every OAC meeting throughout the Monument Project.  (ECF No. 154-9 at 2.)

  After explaining his view on that issue, Oaster stated, "On yet another note, I have no problem looking Bill Tibbets [*sic*] in the eye.  I am not so sure how Bill can look me in the eye!  Here is why I say that . . . ."  (*Id.* at 3.)  Oaster proceeded to summarize how he had decided to work with Great West over WD Construction on a prior project after receiving a bid from Tibbitt containing, in his view, "ridiculous numbers."  (ECF No. 154-14 at 1.)  He further stated:

    When the leadership at Woodmen Monument asked me for a second contractor to compare WD's numbers with, I brought in Great West.  Bill lost the Monument project because he used Mike St. Marie to do his estimates, he adds a ridiculous amount of overhead to the project, he estimated a pre engineered steel building, and his numbers were $800,000 higher than Great West.

    When Bill interviewed with the Monument Team, there were four people from the church.  Following the interview of both

> WD and Great West, I refused to say anything until the other
> three had spoken up and made their recommendation.  All
> three preferred Great West.  I spoke up last and I simply
> agreed that Great West will do an outstanding job.

(*Id.*)  Oaster concluded his email with, "I would greatly appreciate it if you would
keep this between you and I."  (*Id.*)

- On February 21, Khronfeldt forwarded Oaster's February 20 e-mail to Tibbitt,
  adding:

> Here's a fun read for your upcoming plane rides.  I do not
> plan to reply to this any time soon.  In fact my analytic mind
> says I want to counter all these points with a forward to Joe,
> Tojy, Doug and Ed, explaining how we are being extorted by
> Oaster Design (that's a [*sic*] emotional overstatement, but I
> believe has some basis).  I do believe that this is just another
> testimony by Brad about how wonderful, successful and
> accomplished with getting paid for projects he devotes no
> time to.
>
> While you have much better things to do with your time, I
> would like to sit with you over coffee to dissect his reply or at
> least get a few airplane comments from you.
>
> Appreciate your dedication and commitment to the team.

(ECF No. 154-9 at 2.)  According to WD Defendants, "Mr. Tibbitt did not respond
to this email."  (ECF No. 156 at 13.)

- On March 8, Khronfeldt e-mailed Stowell and Thomas, with the subject line
  "Oaster Review."  (ECF No. 154-8 at 1.)  Therein, he states: "Tojy and I met last
  week and he asked me to prepare a summary of our history with Brad Oaster.
  He also asked me to share my review of the budgets prepared by WD
  [Construction] and [Great West] for Monument."  (*Id.*)

Attached to Khronfeldt's email was a document identically entitled "Oaster
Review," containing a two-page, bulleted timeline of WVC's relationship with
Oaster and Khronfeldt's criticisms of him throughout.  (*Id.* at 3–4.)  Such
comments included:

> Since I know we must negotiate (and not bid) a GC, I am
> forced to interview GC's [*sic*] with Brad's involvement.  We
> interview CCI.  Vince C. self-eliminates because he will not
> work with Oaster.  I 'manipulate' the process by next
> presenting Tibbitt, who used to work for Vince, and I knew
> him and his capabilities.  Brad reports to Doug that Vince is

5

not right for us . . . .  Brad recommends Bill as perfect for us.

. . .

We now devote the next year, Oct 2018 – Nov 2019 on Construction Document planning.  I can document why this has been the most unprofessional process I've been involved in, in my 30 years of experience as an Owner's Representative.  The architect's submission to Regional Building for permit approval had the most errors and omissions ever experienced by Bill or me. . . .

. . .

Key to my many objections is Brad's continued misrepresentation of budgetary issues.  At this point, you've heard from Bill (and I would like equal time to present my case) we have both verbal confirmation from meetings as well as written communication from Brad that he distorts facts, misrepresents truths and is seen by professionals in our development community as a manipulative business person with no credibility and who is not taken seriously in the profession.

(*Id.*)

- On March 9, Khronfeldt forwarded his March 8 e-mail to Tibbitt, adding:

  Here's what I sent Joe and Tojy last eve.  As you know, I wrestled with this way too much until yesterday I just sat down and blurted this out.  It should be sufficient to get to the next step.  In prep for next steps, do you have a standard GC interview outline for a Negotiated GC selection from your OR days?

  (ECF No. 154-9 at 4.)  Tibbitt responded: "Great work Les.  I will get to looking for the items you requested."  (*Id.*)

- On March 10, an employee of WD Construction emailed Oaster's Design Team, copying Tibbitt and Khronfeldt, asking, "Have you been able to make any headway on RFI # 16 . . . ?"  (ECF No. 154-9 at 7.)  A member of the Design Team responded, "Let's just say it's on the this [*sic*] of things to do…I will try to get to this before the end of next week."  (*Id.* at 6.)

- On March 11, Tibbitt, responding in the same thread but only to Khronfeldt, sent the following:

    > I would take this and forward it to Ed and copy Tojy and Joe.
    >
    > Dear Ed,
    >
    > Just giving you a heads up on the type of service you can expect from Oaster and his design team.  After an RFI has been out for one (1) month, initiated on February 10th, this is the response we get from Oaster's mechanical engineer.  WD has emailed KB twice prior to the email from Jake below and every time gets told they will get an answer by the end of the week.  WD has also brought this RFI up to Brad at our last OAC meetings.

    (ECF No. 154-9 at 6.)  Khronfeldt replied, "Done and done.  The real issue is – what can we do to fix incompetence?"  (*Id.*)  Ultimately, RFI 16 was not closed until March 23, 2020.  (ECF No. 145 at 5 ¶ 22.)

- On March 13, Khronfeldt sent Stowell (and potentially other members of the Leadership Team) an e-mail with the subject line, "Oaster Action Plan," attaching a Word document entitled, "Oaster Termination_3.16.20."  (ECF No. 154-10 at 1–2.)  Stowell responded: "This all looks good Les. . . . I want to see WD more involved at MO….how would you see that playing out with Oaster out of the picture?"  (*Id.*)

    Khronfeldt's lengthy reply most notably included the following:

    > Once we have Brad out of the way, this will be an easy transition process.
    >
    > . . .
    >
    > Resuming my role as orchestrator, getting the team back to the playbook, and eliminating miscommunication and bad communication will get us back in sync asap, and I'm confident it will regain better stewardship of our resources.
    >
    > . . .
    >
    > Ed thought I was 100% in agreement with he replacing me on the MO project.  I clarified that I was 100% NOT in agreement until the decision was made, and then it's my duty to support leadership . . . .
    >
    > . . .

> Lastly, I told Ed to sit tight and remain moot until he get's
> [*sic*] further guidance from me.  Ed's reply: Sounds good.  I'll
> stall with Doug and Brad. . . . And I'll prep to withdraw from
> the project to let you move forward with your plan.
>
> His last comment was not prompted by me.  I have not
> asked him or implied he needs to withdraw and let me move
> forward.  He could remain an asset and support, although I
> would mostly use him for counsel as we move forward since
> he has proved himself a good accountability partner for me.

   (*Id.*)

- On March 27, Houle e-mailed Tibbitt:

> Doug brought me into the loop regarding developments at
> Woodmen Heights and your future involvement with the
> Monument project. . . . I'd really like to discuss Brad Oaster
> and a decision whether he should remain on the design
> team for the Monument project.  The church has essentially
> left it up to us to make that decision.

(ECF No. 154-11 at 1.)

The Court will collectively refer to the above communications as the "Pre-Termination Communications."

Ultimately, WVC engaged WD Defendants to replace Great West as the general contractor for the Monument Project.  (ECF No. 154 at 9 ¶ 30.)  And on March 30, 2020, WVC terminated the Monument Agreement with Oaster.  (ECF No. 145 at 5 ¶ 23.)  That same day, WD Defendants contacted Bucher Design Studio, Inc., of which Brian Bucher is the principal (together, "Bucher Defendants"), to serve as the architect for the remainder of the Monument Project.  (*Id.* at 5 ¶ 24.)

In August 2023, a panel of three arbitrators ("the Panel") issued an interim ruling in an arbitration between Oaster, as claimant, and WVC, Houle, and Khronfeldt, as defendants, arising out of the same dispute.  (*Id.* at 8 ¶ 40.)  The Panel determined that

Khronfeldt was liable for intentional interference with the Monument Agreement and
further found that he engaged in a conspiracy with Tibbitt.  (ECF No. 154 at 10 ¶ 34.)
The Panel awarded Oaster $265,435.50 on its claims for copyright infringement and
contributory infringement, intentional interference, and civil conspiracy.  (ECF No. 145 at
8 ¶ 41.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit
under the governing law' and is 'genuine[ly]' disputed if 'a reasonable jury could return a
verdict for the nonmoving party.'"  *Alcala v. Ortega,* 128 F.4th 1298, 1306 (10th Cir.
2025) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  Courts
"must view the evidence in the light most favorable to the nonmoving party, as well as
resolve disputed facts and draw 'all justifiable inferences' in favor of the nonmoving
party."  *Alcala,* 128 F.4th at 1306 (quoting *Anderson,* 477 U.S. at 255); *see also Tolan v.
Cotton,* 572 U.S. 650, 656–57 (2014).  However, "'mere speculation, conjecture, or
surmise' cannot defeat a summary-judgment motion, because '[u]nsubstantiated
allegations carry no probative weight in summary judgment proceedings.'"  *Alcala,* 128
F.4th at 1306 (quoting *Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir.
2004)).

## III. ANALYSIS

WD Defendants seek summary judgment on each of Oaster's remaining claims
against them for (1) copyright infringement, (2) contributory copyright infringement,

(3) vicarious copyright infringement, (4) tortious interference, (5) unfair or deceptive trade practices and/or unfair competition in violation of the Colorado Consumer Protection Act ("CCPA"), (6) civil conspiracy, and (7) unjust enrichment.  (*See generally* ECF No. 145.)  They separately seek summary judgment on Oaster's copyright infringement, tortious interference, and civil conspiracy claims because, as a result of the Panel's earlier award, Oaster purportedly has no remaining damages.  (*Id.*)

The Court can resolve the parties' arguments as to Oaster's claims for copyright infringement, violations of the CCPA, and unjust enrichment straight away.  WD Defendants' arguments in favor of summary judgment on Oaster's copyright claims turn entirely on their asserted affirmative defense of license.  (ECF No. 145 at 9–15.)  The Court has held that WD Defendants are precluded from relitigating whether any express license granted pursuant to the Monument Agreement survived the Agreement's termination, and whether WD Defendants otherwise have a defense to infringement insofar as Oaster granted WVC an implied license to use the copyrighted architectural designs.  (ECF No. 162.)  For the same reason, the Court cannot find that WD Defendants have an affirmative defense of express or implied license as a matter of law.  The Motion is thus denied as to Oaster's copyright infringement claims.

Moreover, Oaster states it has "determined to abandon" its fifth claim for unfair or deceptive trade practices and its seventh claim for unjust enrichment and "have them dismissed by the Court."  (ECF No. 154 at 25.)  Oaster represented it would "prepare a stipulated motion to dismiss with prejudice those two claims."  (*Id.*)  Seeing none on file, however, the Court will instead simply grant the Motion based on Oaster's failure to substantively respond to WD Defendants' arguments in favor of summary judgment on

those claims.  *See Hinsdale v. City of Liberal, Kan.,* 19 F. App'x 749, 768–69 (10th Cir.

2001) (affirming summary judgment on claim plaintiff "fail[ed] to address . . . in his

response to defendants' motion for summary judgment").

The Court thus addresses below only WD Defendants' arguments in favor of

summary judgment on Oaster's tortious interference and civil conspiracy claims, as well

as their argument that summary judgment is warranted on all of Oaster's remaining

claims based on its purported lack of damages.

## A.    Tortious Interference

As a threshold matter, WD Defendants note that Oaster's fourth cause of action

could be read to state two different claims insofar as it is entitled "Tortious Interference

with Business Relationship and/or Business Contract."  (ECF No. 1 at 15.)  "Given the

undisputed existence of the Contract between Oaster and WVC, WD [Defendants]

construe[] this claim as a claim for intentional interference with contract" (ECF No. 145

at 15), and Oaster's response similarly addresses only a "Claim for Tortious

Interference with Contract" (ECF No. 154 at 20).  The Court likewise assumes that

Oaster intended to state only a claim for tortious interference with contract and Oaster

will be confined to the same at trial.

"To be liable for intentional interference with contract, a defendant must 1) be

aware of a contract between two parties, 2) intend that one of the parties breach the

contract, 3) and induce the party to breach or make it impossible for the party to perform

the contract."  *Krystkowiak v. W.O. Brisben Cos., Inc.,* 90 P.3d 859, 871 (Colo. 2004).

"In addition, the defendant must have acted 'improperly' in causing the result."  *Id.*

Although the allegations in the Complaint are broader, Oaster now argues its

tortious interference claim is predicated only on an alleged "plot" between Khronfeldt

and Tibbitt.[2]  (ECF No. 154 at 20*; see also* ECF No. 1 at ¶¶ 110–19.)  Specifically, it

asserts that, after WD Construction was passed over to serve as the general contractor

for the Monument Project in January 2020, "Khronfeldt . . . and [] Tibbitt . . . created a

plot whereby [] Khronfeldt would be placed back in control of the Monument Project, WD

Construction would obtain an $8 million dollar contract, and Oaster [] would be

terminated."  (ECF No. 154 at 20.)  Oaster alleges that "Khronfeldt poisoned the minds

of the [L]eadership [T]eam" against it "[i]n private meetings and in writing," while "Tibbitt

provided Khronfeldt with the 'ammunition'" to do so.  (*Id.*)

Notably, Oaster's briefing is at times ambiguous as to whether the underlying

contract at issue is the Monument Agreement, or both the Monument Agreement *and*

the Heights Agreement.  Nevertheless, it seems to most consistently argue that WD

Defendants (and Khronfeldt) interfered with a single contract.  The Court thus presumes

the tortious interference claim is directed at WD Defendants' alleged interference with

*only* the Monument Agreement, and it will hold Oaster to this theory at trial.

WD Defendants do not dispute that they were aware of the Monument

Agreement.  (ECF No. 145 at 16.)  But they argue Oaster cannot establish that WD

Defendants intentionally induced WVC to breach the Monument Agreement, nor that

they did so through improper means.  The Court disagrees and finds there is sufficient

evidence to raise a genuine issue of material fact as to both elements of Oaster's

---

[2] The parties appear to assume that WD Construction is liable for any acts attributable to
Tibbitt, and vice versa.  As the parties have not presented it as an issue for its consideration, the
Court assumes the same.

tortious interference claim.

Per the Restatement, "[t]here is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract."  Restatement (2d) Torts § 766, cmt. k.  Rather, interference by inducement "may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other," including "a simple request or persuasion exerting only moral pressure" or "a statement unaccompanied by any specific request but having the same effect as if the request were specifically made."  *Id.*  And such interference is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action."  Restatement (2d) Torts § 766A, cmt. e.

As evidence of the alleged plot between Khronfeldt and Tibbitt, Oaster primarily relies on the Pre-Termination Communications summarized at length in Section I *infra*. The Court will not rehash the contents of those Communications here, but it agrees with Oaster that they are sufficient evidence to raise a fact question as to whether WD Defendants intentionally induced WVC to terminate the Monument Agreement with Oaster.  For instance, a reasonable jury could find that the intended effect of Tibbitt's March 11 e-mail reporting on Oaster's purported poor management of the Heights Project was that the Leadership Team terminate Oaster from the Monument Project. And while the March 11 e-mail is likely the most significant piece of evidence against Tibbitt, insofar as it includes a direct communication from him, even the other Pre-Termination Communications are at least circumstantial evidence of Tibbitt's involvement in the efforts to persuade the Leadership Team (directly or indirectly) that

Oaster should not continue as architect for the Monument Project.

As to whether WD Defendants' alleged "conduct in intentionally interfering with a

contract or a prospective contractual relation of another [was] improper or not,"

Colorado courts generally consider:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actors' conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

Restatement (2d) Torts § 767; *see also Warne v. Hall,* 373 P.3d 588, 596 (Colo. 2016)

("Because it is so clearly dependent upon context and circumstances, we have never

attempted to rigidly define 'improper' for all purposes of interference with contract, but

we have favorably referenced the Restatement (Second) of Torts § 767 [] in this regard

and its enumeration of potentially relevant factors . . . .").

Oaster argues that "[t]he pecuniary motives of WD [Defendants], [Tibbitt's] desire

to be hired as the contractor, as well as the interest of Oaster to fulfill its contract are

significant factors supporting improper conduct."  (ECF No. 154 at 23.)  The Court

agrees.  The Court takes particular note of the Restatements' guidance that, where the

interests sought to be advanced by the actor (here, WD Defendants) are economic, "[i]f

the interest of the other [here, Oaster] has been already consolidated into the binding

legal obligation of a contract, . . . that interest will normally outweigh the actor's own interest in taking that established right from him."  *See* Restatement (2d) Torts § 767, cmt. f.

WD Defendants most significantly counterargue that Tibbitt's e-mail concerning the Design Team's delayed response to RFI 16 cannot support a finding that any alleged interference was improper (or, for that matter, intentional) because "[i]t is not wrongful or improper for a general contractor to send an email regarding project issues and scheduling problems on a construction project."  (ECF No. 145 at 18.)  They assert that Tibbitt's e-mail "notifying WVC of issues that it had on the Heights Project, including issues and delays in getting responses to RFI's and information WD [Construction] needed from [] Oaster's Design Team, are [*sic*] consistent with WD [Construction's] role as a general contractor trying to progress construction of the Heights Project."  (*Id.*)  Tibbitt testified he sent the e-mail because he "needed help with managing the design team."  (ECF No. 145-4 at 120:5–8.)  Thus, according to WD Defendants, "[t]his type of routine contract administration and reporting to WVC, WD [Construction's] client and the project owner, cannot give rise to any inference of the type of improper or wrongful acts required to support Oaster's claim for intentional interference with a business contract."  (ECF No. 145 at 18.)

However, "if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere," he is not insulated from liability "even though he acts for some other purpose in addition."  Restatement (2d) Torts § 766, cmt. j.  Thus, to the extent WD Defendants argue their interference with the Monument Agreement "was not desired and was purely incidental in character," that will

be "a factor to be considered in determining whether the interference is improper."
Restatement (2d) Torts § 767, cmt. d.  But such questions will be subsumed in the jury's
factual inquiry into whether Tibbitt "was motivated, in whole or in part, by a desire to
interfere with [Oaster's] contractual relations."  *Id.*

For these reasons, the Court finds that Oaster has a triable claim that WD
Defendants intentionally interfered with the Heights and Monument Agreements.

**B.    Civil Conspiracy**

"To establish a civil conspiracy in Colorado, a plaintiff must show: (1) two or more
persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or
course of action; (4) an unlawful overt act; and (5) damages as to proximate result."
*Nelson v. Elway,* 908 P.2d 102, 106 (Colo. 1995).  "In a civil action, conspiracy is a
derivative cause of action that is not actionable per se."  *Double Oak Const., L.L.C. v.
Cornerstone Development Intern., L.L.C.,* 97 P.3d 140, 146 (Colo. App. 2003),
*overruled on other grounds by L.H.M. Corp., TCD v. Martinez,* 499 P.3d 1050 (Colo.
2021).  "[T]he essence of a civil conspiracy claim is not the conspiracy itself, but the
actual damages resulting from the acts done in furtherance of the conspiracy."
*Resolution Tr. Corp. v. Heiserman,* 898 P.2d 1049, 1055 (Colo. 1995).  Thus, it "is
essentially a means of holding one defendant liable for the substantive wrongs
committed by another."  *Tara Woods Ltd. P'ship v. Fannie Mae,* 731 F. Supp. 2d 1103,
1122 (D. Colo. 2010); *see also Shell v. Am. Fam. Rights Ass'n,* 899 F. Supp. 2d 1035,
1063 (D. Colo. 2012) ("the purpose of the conspiracy claim is to hold named Defendants
liable for the unlawful acts allegedly committed by their purported co-conspirators");
*Johnstown Feed & Seed, Inc. v. Continental W. Ins. Co.,* 641 F. Supp. 2d 1167, 1183–

84 (D. Colo. 2009) (civil conspiracy "is a means by which a plaintiff can impose liability on one party for unlawful conduct engaged in by another").

The Court once again observes that, while the allegations in the Complaint are broader, Oaster appears to now assert only that Khronfeldt and WD Defendants conspired "to accomplish the unlawful goal of causing WVC to breach its contract with Oaster Development."  (ECF No. 154 at 24; *see also* ECF No. 1 at ¶¶ 135–146.)  And once again, the Court advises Oaster that it will hold it to this theory of its civil conspiracy claim at trial.

WD Defendants argue that Oaster's civil conspiracy claim fails because there is no evidence that (1) Tibbitt and Khronfeldt "enter[ed] into an agreement to conspire to terminate Oaster from the Project and hire WD [Construction]," (2) there was an unlawful overt act, or (3) damages resulting from the conspiracy.  (ECF No. 145 at 25–27.)  The Court disagrees, with one caveat.

As to the first issue, a court may not infer the agreement necessary to form a conspiracy.  *Nelson,* 908 P.2d at 106.  Rather, the plaintiff must present "some indicia of agreement in an unlawful means or end," which can be direct or "implied by a course of conduct and other circumstantial evidence."  *Schneider v. Midtown Motor Co.,* 854 P.2d 1322, 1327 (Colo. App. 1992) (internal citation omitted).  Oaster argues that, here, "the emails and Khronfeldt's 'Action Plan'" establish Khronfeldt and Tibbitt's "agreement to take joint action" "to accomplish terminating Oaster and Great West, reinstating Khronfeldt as the owners rep, and reversing the decision denying WD [Construction] the Monument contract."  (ECF No. 154 at 24.)  The Court agrees with Oaster that the Pre-Termination Communications are sufficient evidence to create a fact issue as to

whether Khronfeldt and Tibbitt had such an agreement. *See Gas Prods. Corp. v. BTU Mktg., LLC,* 2017 WL 4222619, at *11 (D. Colo. Sept. 22, 2017) (denying summary judgment where co-conspirator's deposition testimony was "sufficient to imply an agreement to misappropriate [plaintiff's] trade secrets"). The Court in particular notes Tibbitt's response to Khronfeldt's March 9 e-mail ("Great work Les."), which suggests to the Court they were working toward a common aim. (*See* Section I *infra.*)

WD Defendants next argue that, "[e]ven if there had been some agreement between Mr. Tibbitt and Mr. Khronfeldt," Oaster cannot "point to any evidence of an unlawful overt act . . . ." (ECF No. 145 at 25–26.) However, Oaster argues "the unlawful action taken was to wrongly interfere with the Monument Agreement between Oaster and WVC." (ECF No. 154 at 24.) Courts routinely find that a claim for tortious interference with contract can comprise the underlying wrong for a civil conspiracy. *Bituminous Cas. Corp. v. Hartford Cas. Ins. Co.,* 2013 WL 452374, at *9 (D. Colo. Feb. 6, 2013) ("Since there are disputed issues of material fact sufficient for the tortious interference claim to survive summary judgment, I find there are likewise disputed issues of fact concerning the wrongful act element of the civil conspiracy claim.").

Nevertheless, to the extent Oaster's civil conspiracy claim is predicated on *WD Defendants'* alleged tortious interference with the Monument Agreement, its civil conspiracy claim appears superfluous. *See Johnstown Feed & Seed,* 641 F. Supp. 2d at 1183–84 ("Logically, an unlawful act committed by Continental itself, rather than by a coconspirator, would be directly actionable."); *Shell,* 899 F. Supp. 2d at 1063–64 (dismissing claim alleging civil conspiracy between defendant and dismissed defendant because it was "entirely redundant of the misappropriation of trade secrets claim

already asserted against [defendant] and does not need to be pled as a duplicative derivative claim"); *Fannie Mae,* 731 F. Supp. 2d at 1122 ("conspiracy allegation will only become necessary if the Court determines that the Plaintiff lacks evidence that a Defendant personally participated in a particular unlawful act; upon proof that the Defendant nevertheless conspired to bring about that act, the Court could still hold that Defendant liable for damages resulting therefrom").  As there is nonetheless sufficient evidence for a jury to find that the unlawful overt act element is technically met, the Court will not grant summary judgment on the civil conspiracy claim to the extent it is premised on WD Defendants' alleged unlawful acts as redundant at this time.  However, it advises Oaster to consider whether there is anything to be gained from trying such a claim when WD Defendants are the only defendants remaining.

On the other hand, should Oaster instead seek to hold WD Defendants liable for *Khronfeldt's* alleged unlawful acts via its civil conspiracy claim, the caselaw supports that Oaster must independently establish at trial that Khronfeldt's underlying wrongs would support a cause of action—notwithstanding any earlier finding by the Panel.[3] *See Double Oak Constr.,* 97 P.3d at 146 ("If the acts alleged to constitute the underlying wrong provide no cause of action, then there is no cause of action for the conspiracy itself."); *Ekberg v. Speicher,* 2024 WL 4578665, at *3–4 (Colo. App. Oct. 24, 2024) (trial court erred in instructing jury that defendant's alleged co-conspirator had already been found liable for civil conspiracy in an earlier proceeding).  In that circumstance, WD

---

[3] Notably, Oaster has not asked the Court to apply preclusive effect to any finding by the Panel that Khronfeldt committed an unlawful overt act sufficient to support a conspiracy.  (*See generally* ECF No. 144.)

Defendants' argument that Khronfeldt, as an agent of WVC, "cannot tortiously interfere with the Contract of his employer" becomes relevant.  (ECF No. 145 at 26.)[4]

An agent who, "while acting within the scope of official duties, causes his or her principal to breach a contract generally will not be held liable for tortious interference with that contract" if they "acted, in part at least, to serve the corporation's interests." *W.O. Brisben Companies,* 66 P.3d at 136.  However, as Oaster points out, the privilege is not absolute.  "[A]n agent acts improperly," and thus may be held liable for intentional interference, "when he or she is motivated solely by the desire to harm one of the contracting parties or to interfere in the contractual relations between the parties."  *Id.* at 137; *see also id.* (agent may be liable if they were "motivated out of personal animus towards one or both of the contracting parties").

Oaster appears to argue that Khronfeldt could not have been acting within the scope of his agency in interfering with the Monument Agreement because he "was removed as owner's representative for the Monument Project and replaced by Ed Houle," and thus "had no responsibilities regarding the Monument Project" "[i]n February and March of 2020."  (ECF No. 154 at 24.)  Despite this, the Pre-Termination Communications demonstrate that Khronfeldt was entrenched in the oversight of the Monument Project and a driving force in the Leadership Team's ultimate decision to replace Oaster and Great West with Bucher Defendants and WD Defendants, respectively.  Indeed, even WD Defendants acknowledge Oaster's deposition testimony that "Khronfeldt went to the [L]eadership [T]eam and blamed the whole thing on me and

---

[4] As an aside, the fact that a party could not be held directly liable for tortious interference "does not mean . . . that [it] cannot be among the two or more parties necessary to conspire to commit that tort."  *Bituminous Cas. Corp.,* 2013 WL 452374, at *10.

said, The Oaster Design Team is incompetent" and "this is just one of the problems that he dreamt up to get us fired."  (ECF No. 145 at 21 (quoting ECF No. 145-1 at 227:18–23).)  The evidence is sufficient to raise a fact issue as to whether Khronfeldt's actions were motivated out of personal animus toward the Leadership Team, Oaster, or both.

Lastly, WD Defendants argue that Oaster cannot establish damages because it was the Leadership Team, not WD Defendants or Khronfeldt, that made the decision to terminate the Monument Agreement, and they are no longer parties to the case.  (ECF No. 145 at 26–27.)  WD Defendants' argument misses the mark because it assumes that the unlawful overt act underlying the conspiracy was the termination of the Monument Agreement itself.  (*Id.* at 27 ("the overt act that allegedly caused Oaster's damages, namely termination of the Contract, was not made by an individual in the alleged conspiracy").)  As discussed above, the underlying wrong is WD Defendants' and/or Khronfeldt's *intentional interference* with the Monument Agreement.  It is the damages resulting from this intentional interference that form the basis for Oaster's civil conspiracy claim.  *Heiserman,* 898 P.2d at 1055.

For all these reasons, the Motion is denied as to the civil conspiracy claim.

## C.     Damages

Finally, WD Defendants argue they should be awarded summary judgment on Oaster's copyright infringement, tortious interference, and civil conspiracy claims because the Panel already awarded Oaster damages on those claims against WVC and Khronfeldt, and it cannot now double recover against WD Defendants.  (ECF No. 145 at 28.)  Notably, Oaster did not advance a legal argument in response to WD Defendants' invocation of the double recovery rule—an oversight upon which the Court looks poorly.

Nevertheless, the Court finds that WD Defendants' argument fails for two reasons.

*First,* WD Defendants premise their argument on Oaster's representation in the Scheduling Order that it estimated its actual damages, "due to Defendants' alleged infringement," were $200,000.  (ECF No. 64 at 4.)  Since the Panel awarded Oaster $160,000 against WVC on its copyright infringement claims and $105,435.50 against Khronfeldt on its intentional interference and conspiracy claims, exceeding the $200,000 estimate, WD Defendants reason that Oaster "has already . . . been made whole." (ECF No. 145 at 28; *see also* ECF No. 145-21 at 22.)

But WD Defendants ignore that Oaster also stated in the Scheduling Order that it sought disgorgement of profits in connection with its copyright infringement claims and estimated that "WD [] Defendants . . . realized . . . $1,871,919.15 in profits attributable to its [*sic*] infringement of Plaintiff's copyrights."  (ECF No. 64 at 4; *see also* ECF No. 154 at 6 ¶ 42 (noting "Plaintiff also seeks profits of the infringer")).  Moreover, Oaster's $200,000 estimate appears not to have included damages attributable to "Defendants' tortious conduct," nor any attorneys' fees to which it claims entitlement.  (*Id.* at 4–5.) These damages allegedly recoverable from WD Defendants were not previously considered by the Panel.

*Second,* even to the extent Oaster claims actual damages in this action that overlap with those already awarded by the Panel against WVC and Khronfeldt, this does not automatically preclude Oaster from seeking to hold WD Defendants liable for the same damage.  Another district court in this Circuit previously considered "whether an arbitration award against one party precludes a plaintiff from pursuing the same judgment in a different cause of action in federal court against another party."  *Cantu*

*Servs., Inc. v. Worley,* 2020 WL 6140727, at *2 (W.D. Okla. Oct. 19, 2020).  It observed

that, per the Restatement, "[w]hen [a] claimant . . . brings consecutive actions against

different persons liable for the same harm, the rendition of the judgment in the first

action does not terminate the claims against other persons who may be liable for the

loss in question."  Restatement (2d) Judgments § 49.  Thus, a plaintiff is "not precluded

from holding multiple defendants liable for the same damage, but rather '*payment* by

one obligor extinguishes the liability of both.'"  *Worley,* 2020 WL 6140727, at *2 (quoting

*Conklin v. Comm'r,* 897 F.2d 1027, 1029 (10th Cir. 1990) (citation omitted)).  Put

differently, "while a plaintiff is precluded from double recovery, a plaintiff is not

precluded from pursuing *judgment* for the same damage from multiple defendants."

*Worley,* 2020 WL 6140727, at *2.  Based on these principles, the district court

concluded the plaintiff could pursue lost profits against the defendant, notwithstanding

an earlier arbitration award holding another party liable for lost profits arising from the

same harm.  *Id.*

        Thus, the Court agrees with WD Defendants that, should the jury award Oaster

actual damages arising from the same harm already redressed by the Panel, the double

recovery rule may preclude Oaster from twice *collecting payment* for those damages.

However, the Court declines to fully resolve that issue in the abstract now, where WD

Defendants do not argue that WVC and/or Khronfeldt have tendered payment on the

confirmed arbitration award.  In the meantime, Oaster is entitled to pursue judgment

against WD Defendants for even identical harms.

        For these reasons, the Court denies the Motion to the extent it seeks summary

judgment on all remaining claims based on Oaster's purported lack of damages.

## IV. CONCLUSION

For the reasons set forth above, WD Defendants' Motion for Summary Judgment (ECF No. 145) is GRANTED IN PART and DENIED IN PART as follows:

1.      The Motion is GRANTED as to Oaster's fifth cause of action for violations of the CCPA and seventh cause of action for unjust enrichment.  (ECF No. 1 at ¶¶ 120–134; *id.* at ¶¶ 147–151.)

2.      The Motion is DENIED in all other respects.

3.      This case remains set for a Final Trial Preparation Conference on **September 19, 2025 at 11:00 a.m.** and a 5-day Jury Trial to commence on **October 6, 2025 at 8:30 a.m.** in Courtroom A801.

Dated this 24th day of April, 2025.

BY THE COURT:

William J. Martínez
Senior United States District Judge